**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| **SHAMINA CAMPBELL,** ) | |
| *on behalf of her minor child D.T.,* ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-cv-12599-DJC** |
| ) | |
| **ANDREW SAUL,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                 **February 25, 2020**

**I.      Introduction**

Plaintiff Shamina Campbell ("Campbell") filed a claim, on behalf of her daughter, D.T., for Supplemental Security Income ("SSI") benefits with the Social Security Administration ("SSA") in May 2017. R. 250.[1]  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Campbell brings this action for judicial review of the final decision of Andrew Saul, Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") denying D.T.'s claim.  R. 12.  Campbell has moved to reverse and remand the ALJ's decision denying D.T.'s SSI benefits, D. 15, and the Commissioner has moved to affirm the ALJ's decision.  D. 19.  For the reasons discussed below, the Court DENIES

---

[1] "R." refers to citations to the Administrative Record, filed at D. 13.

1

Campbell's motions to reverse and remand, D. 15 and ALLOWS the Commissioner's motion to affirm, D. 19.

## II.    Factual Background

Campbell alleges that her now twelve-year-old daughter D.T. is disabled based upon attention deficit hyperactivity disorder ("ADHD"), learning disability, mood disorder, anxiety disorder, obsessive compulsive disorder ("OCD") and autism spectrum disorder.  D. 16 at 1.

## III.    Procedural History

In May 2017, Campbell filed an application for SSI benefits, asserting that D.T. had been disabled since April 11, 2017.  R. 250.  After an initial review, the SSA denied D.T.'s claims. R. 183.  Campbell requested reconsideration of D.T.'s claims, R. 186, but the SSA again found D.T. ineligible for benefits.  R. 190.  Campbell requested a hearing before an ALJ.  D. 193.  After a May 1, 2018 hearing, the ALJ, in a written decision dated July 2, 2018, determined that D.T. was not disabled and denied her claims.  R. 15.  Campbell requested review of the ALJ's decision.  R. 243.  On October 23, 2018, the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner.  R. 1.

## IV.    Legal Standards

### A.    <u>Entitlement to Disability Benefits and Supplemental Security Income</u>

SSA defines a child under the age of eighteen as disabled if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner must follow a three-step evaluation process to determine whether a child is eligible for SSI benefits.  20 C.F.R. § 416.924(b)-(d).  If the commissioner finds

conclusively that the child is not disabled at any point in the process, review does not proceed to the next step. Id. § 416.924(a). The Commissioner considers whether the child 1) is engaged in substantial gainful work activity; 2) has a severe impairment or severe combination of impairments; 3) has an impairment that meets, medically equals, or functionally equals the listed impairments in the Social Security regulations. Id. § 416.924(a)-(d); A.G.C. v. Colvin, 16-30015-KAR, 2017 WL 1026420, at *1 (D. Mass. Mar. 16, 2017).

B.    Standard of Review

This Court may affirm, modify or reverse a decision of the Commissioner. See 42 U.S.C. § 405(g). Such judicial review, however, "is limited to determining whether [the Commissioner] deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)). The ALJ's findings of fact are conclusive and must be upheld by the reviewing court when supported by substantial evidence "even if the record arguably could justify a different conclusion." Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted). Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion," Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Such findings are conclusive when supported by substantial evidence "but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." See Nguyen, 172 F.3d at 35 (internal citations omitted).

V.    **Before the ALJ**

A.    <u>**Medical and Educational Records Presented to the ALJ**</u>

When considering D.T.'s application, the ALJ examined evidence regarding D.T.'s medical history, her educational records and the testimony of her mother, Campbell.

In April 2016, D.T. met with Kelly Macaulay, M.D. because she was having difficulty paying attention in class. R. 373. D.T. had recently received an Individual Educational Program ("IEP") at school after teachers noted that she was not making progress even with support. <u>Id.</u> Campbell informed Dr. Macaulay that a few weeks earlier, D.T. had taken a knife from the kitchen because she believed a friend had threatened her, but that she has not had any subsequent worries about D.T. hurting herself or others. <u>Id.</u> Dr. Macaulay also noted that D.T. got along with friends her own age, that her maturity level was on par for her age and described D.T. as interactive and alert. <u>Id.</u>

D.T.'s 2016-2017 school report summary for fourth grade noted that she required teacher assistance to complete daily reading lessons due to difficulties focusing on tasks. R. 548. These difficulties impacted her academic progress. <u>Id.</u> D.T. needed constant reminders to face the teacher and listen to the speaker during class. <u>Id.</u> During class, D.T. would often doodle, draw on her clothes and look at the floor or ceiling. <u>Id.</u> The summary also noted that D.T. was working toward self-editing her written work, demonstrated solid comprehension skills and enjoyed reading independently. <u>Id.</u> D.T. was able to find the main idea of a grade-level passage and could sometimes make reasonable predictions. <u>Id.</u>

In April 2017, D.T. was evaluated by Dr. Elizabeth B. Caronna. R. 345. Dr. Caronna noted, based upon information from Campbell, that D.T. tended to gravitate towards younger children and had difficulty relating to her peers. R. 347. Campbell shared that D.T. had chased

4

another child with a brick and pulled a knife on her sister.  Id.  Campbell noted behavior challenges at home, "but is most concerned about her executive functioning," i.e., "constant prompting to get dressed, clean herself in the shower, complete her homework, etc." and challenges with social interactions.  Id.  Dr. Caronna concluded that D.T.'s presentation was consistent with ADHD and that D.T. had a learning disability in math and atypical pragmatic communication.  R. 353.  Dr. Caronna noted that D.T. required additional testing of her social communication, counseling to address self-regulation and possible adjustment disorder and suggested considering psychopharmacologic management.  Id.  Dr. Caronna advised Campbell to request a speech and language evaluation for a suspected communication disorder and recommended Ritalin (or equivalent stimulant medication) and classroom accommodations for D.T.'s ADHD.  R. 342.

In May 2017, D.T. visited Jenny Raphael, M.D. to follow up on the recommendation for stimulant therapy for her ADHD diagnosis.  R. 338-39.  Campbell reported to Dr. Raphael that D.T.'s teachers said that D.T. had a hard time paying attention in school, had a short attention span, but did well with one-on-one instructions and has some accommodations in place.  R. 339.  For example, Campbell noted that D.T. needed to be removed from class during tests to minimize distractions and that she was placed in small groups for reading and math.  Id.  At home, Campbell shared that D.T. often does not respond until the second or third time that she is called.  Id.  Dr. Raphael prescribed Ritalin to D.T.  Id.

In May and June 2017, D.T. underwent testing with Boston Public Schools ("BPS") psychologist Ilana Achildiyev to determine her eligibility for additional special education services. R. 464.  The testing concluded that D.T. was below average in written expression, mathematics, math fluency, intellectual functioning, visual spatial, working memory and processing speed skills. R. 471, 486.  Dr. Achildiyev noted, that despite the current amount of specialized instructional

services, accommodations and modifications, D.T. was demonstrating slow and steady, yet not effective academic progress in her general education classroom setting. R. 485. Dr. Achildiyev noted that D.T. was friendly and cooperative during the testing, made appropriate eye contact, demonstrated good attention and concentration during the test and her overall effort and motivation through the testing was good. Id. Dr. Achildiyev concluded that "[b]ased on current test findings of her cognitive and academic profile, D.T. presents with a Specific Learning Disability in math and written expression" and "[b]ased on her behavioral profile, D.T. presents with an educationally-based Autism disability" and that she also has a health impairment disability due to her diagnosis of ADHD. R. 487. As a result, the doctor concluded that D.T. was eligible for an increased in specialized instructional services to address her disabilities and made several recommendations in this regard. Id. at 487-89.

D.T. returned to Dr. Caronna for a followup visit in June 2017. R. 421. Campbell reported that D.T. was tolerating the Ritalin, that she thought the medication was having some positive effects and that it "relaxes" D.T. Id. Campbell reported that D.T. was repeating inappropriate phrases she hears, was sensitive to some loud noises and smells and could be inflexible and upset about changes in routine. Id. As reported by Campbell, D.T. had threatened her sister with a knife, but had not made any such threats since that time. Id. During the evaluation, D.T.'s speech was intelligible, but notably monotone and she had restricted range of affect. R. 422-23. D.T. expressed anxiety in her comments, showed unusual social interactions and poor pragmatic skills. R. 424. Dr. Caronna concluded that this behavior was not a result of autism spectrum disorder, but instead was likely related to her behavioral health diagnosis. Id. Dr. Caronna made several recommendations including a followup visit once she had been in treatment with a psychotherapist. R. 424-25.

Also in June 2017, Dr. Celeste N. Derecho, an advising psychologist to the Disability Determination Services ("DDS") concluded that D.T. was not disabled.  R. 168.  Dr. Derecho noted that D.T. had been diagnosed with ADHD and learning disabilities, had recently lost her father and "has some acting out behaviors."  Id.  Dr. Derecho also noted, however, many areas of D.T.'s functioning were within normal limits.  Id.  Dr. Derecho concluded that D.T. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others and caring for herself, R. 167, and had no limitation in moving about and manipulating objects and her health and physical well-being.  Id.

D.T's 2017-2018 IEP noted that she had strategies to perform calculations and her reading level was approaching the grade level standard.  R. 407.  D.T., however, still struggled to determine implicit meaning in reading, needed prompting to go back to passages to answer explicit questions, struggled with organization, mechanics and legibility in writing.  Id.  D.T. had difficulty paying attention in group lessons, following the daily schedule and required frequent redirection.  Id.  The IEP noted that D.T. had a specific learning disability in math and written expression in addition to her ADHD and had many characteristics of individuals with autism spectrum disorder.  Id.  As a result, the IEP recommended that D.T. "receive specially-designed instruction in reading/writing and math in a substantially separate LD classroom setting," participate in a weekly social skills group session with the school psychologist and was eligible for door-to-door transportation.  Id.

In July 2017, D.T. met with Dana An, LICSW for an intake evaluation.  R. 517.  Campbell reported to An that, for the past year, D.T. had symptoms of irritability and aggression, and, for the past several years, had anxiety and did not sleep well.  Id.  An noted, based upon reports from Campbell, that D.T. was afraid of being in spaces with a lot of people and that D.T.'s father, to whom she was very close, had died in August 2016.  R. 520.  An diagnosed D.T. with anxiety

disorder with symptoms of depression and mild agoraphobia, personality disorder, ADHD and psychosocial issues.  Id.

In August 2017, another consulting psychologist to DDS, Dr. John Burke, concluded that D.T. was not disabled.  R. 178.  Dr. Burke concluded that D.T. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others and caring for oneself, R. 177, and had no limitation in moving about and manipulating objects or her health and physical well-being.  R. 177-78.

D.T. met with An on several occasions in August, September and October 2017.  R. 501-16.  An noted that D.T. did not make eye contact, her speech was fluent at times and mumbled at times, her memory was unclear, and she talked about nightmares of monsters coming to take her away.  R. 508, 512.  During a meeting in September, An noted that D.T. appeared "spacey," did not make eye contact, had unusual thinking, was anxious and her affect was flat.  R. 505.  In October 2017, An noted that D.T. appeared less spacey, somehow oriented, but did not make eye contact, her speech was fluent, memory intact, mood was calm, and Campbell reported that D.T. was looking forward to her therapy visits.  R. 611.  An reported that D.T. stated that she did feel anxious most of the time and noted that she still has paranoia and fear in crowds.  R. 612.  An noted that D.T. met the criteria for mood disorder, generalized anxiety disorder and autism spectrum disorder.  R. 611-12.

In November 2017, D.T. met with Dr. Laura Wieczorek twice.  R. 601, 605.  At some point prior to these sessions, D.T. was switched from Ritalin to Adderall.  R. 29; see R. 607 (noting that D.T.'s current medication on November 2, 2017 was Adderall and past medication had been Ritalin).  During the first meeting, D.T. told Dr. Wieczorek that she was friends with all the girls in her class.  R. 606.  She informed Dr. Wieczorek that she played video games in her free time

and had no difficulty paying attention in class.  Id.  She did report having difficulty sleeping because she heard crickets at night. Id.  Campbell informed Dr. Wieczorek that D.T. seemed to be responding better to Adderall and had improved concentration and focus.  Id.  Campbell, however, noted that D.T. reported that the medication wore off in the early afternoon around lunch time and then she had more trouble focusing.  Id.  Dr. Wieczorek switched D.T. from Adderall instant release ("Adderall IR") to Adderall extended release ("Adderall XR").  R. 608.  She also prescribed Citalopram to D.T. for her anxiety.  Id.  During the second November meeting, D.T. reported that the Adderall XR assisted her with being more alert, that her concentration and focus were good but that the medication would start to wear off by the end of the school day.  R. 602. D.T. had not been able to tolerate swallowing the Citalopram, but Campbell was open to having her try it in a liquid form.  Id. D.T. also reported that she got along better with her peers, that nine out of eleven students in her class were her good friends and that she denies any arguments with teachers.  Id.  Campbell informed Dr. Wieczorek that D.T.'s attention and concentration were better in school.  Id.  Campbell stated that D.T. was more social, less resistant to going places, improving significantly in her education, less irritable with her cousins, more cooperative, less guarded and her speech was more spontaneous.  Id.

In January 2018, Dr. Wieczorek met with D.T. initially and then with Campbell.  R. 587. D.T. informed Dr. Wieczorek that her family had recently moved and she did not like her new place which she thought was haunted.  Id.  D.T. mentioned that she had several friends, was getting along "okay" with her sister and was not worried about anything except the new house being haunted.  Id.  In terms of school, she didn't report any concentration difficulties and was finding the schoolwork easy.  Id.  Campbell informed Dr. Wieczorek that D.T. was remaining focused with her current medication, doing well in school and less anxious on the Citalopram. R. 588.  Dr.

Wieczorek noted that D.T.'s attention and concentration were good; memory was intact, but while her speech was spontaneous, her rhythm was robotic at times in nature.  R 589.  Dr. Wieczorek observed that D.T. had mild fidgeting, but also noted that she was more cooperative, less anxious since she started the Citalopram and is being familiar with the doctor, but "difficulty with social pragmatics/relatedness apparent."  Id. The doctor also noted that D.T.'s responses to Adderall appeared better as compared to prior medication, Ritalin.  Id.

D.T. met with An in February and March 2018.  R. 576, 580.  Campbell told An that D.T. seemed happy at her new school and liked the other girls.  R. 577.  An noted that D.T.'s ability to cooperate was improving.  R. 580.  D.T. also talked to An about her new room and stated that she did not like to go out, refused to go paintballing with her mom, and instead stayed in her room to play with her tablet and PSP4.  R. 581.  D.T. also stated that she was still sensitive to noises and felt anxious most of the time.  R. 577-78.  An's notes indicate that D.T. will continue appointments every other week.  R. 578.

In April 2018, Campbell informed Dr. Wieczorek that D.T.'s teachers reported that D.T. was cooperative in class and communicating well with her peers and teachers.  R. 573.  Campbell had not received any concerning phone calls from school about D.T.  Id.

**B.      ALJ Hearing**

At the May 1, 2018 hearing, the ALJ heard testimony from Campbell.  R. 120.  Campbell testified that D.T. is currently enrolled in elementary school in a special education class with a maximum of twelve students and other accommodations under her IEP.  R. 124-26.  Campbell noted that while D.T. can read, she is doing poorly in all her other subjects, especially math.  R. 127, 129.

D.T. currently takes Adderall in the morning and anxiety and depression medication at night.  R. 130-31.  Campbell testified that D.T.'s behavior is better in the smaller class but that even after taking medication, D.T. still gets into fights on the bus and being disruptive.  R. 129.  Campbell has received reports from the bus monitor that D.T. will be pulled off the bus if she does not keep her hands to herself.  R. 150-51.  Campbell testified that D.T. has difficulty interacting with other children at school and that she only has one friend.  R. 150.

According to Campbell, D.T. has difficulty interacting with people outside of school as well.  Campbell testified that D.T. does not like going out in public, is frightened by strangers and becomes clingy in public because she fears that people are looking at her.  R. 138.  Campbell stated that D.T. pulled a knife on her older sister and as a result, she tends to stay away from D.T.  R. 155.  She also testified that it can be overwhelming for D.T. when her cousins come over on the weekend to play with her.  R. 134.  D.T. has pulled out a knife in front of her cousins, grabbed rocks to hit them and they physically push each other.  R. 149-50.

Campbell specified that D.T. does not properly bathe herself, needs reminders about proper hygiene and needs assistance with getting dressed in the morning because she is messy.  R. 133-34; 153-57.  Campbell stated that she "do[es] everything for D.T." except when she is at school.  R. 137.

Campbell testified that D.T. still struggles to remain focused.  D.T. habitually stares off into space, zones out and has difficulty concentrating.  R. 153.  Campbell also noted that D.T. goes back and forth between her activities such as her PS4 [video game console] and tablet and will spend about 15-20 minutes on each.  R. 146.  Campbell stated that D.T. used to watch shows that contained "witchcraft" that D.T. believed were real because she has difficulty distinguishing fact from fiction.  R. 141.  D.T.'s psychiatrist recommended blocking those type of shows.  R. 142.

Campbell also testified that her current medication calms D.T. down a little, she still has difficulty sitting still.  R. 147.

C.    **Findings of the ALJ**

The ALJ found that D.T. did not have a disability within the meaning of the SSA. R. 15. At step one, the ALJ found that D.T. had not engaged in substantial gainful activity since the application date of May 1, 2017.  D. 18.   At step 2, the ALJ found that D.T. has severe impairments:  ADHD, learning disorder, mood disorder, anxiety disorder and autism spectrum disorder.  Id.

At step 3, the ALJ evaluated D.T.'s severe impairment under listings 112.04 (depressive, bipolar and related disorders), 112.06 (anxiety and obsessive-compulsive disorders ("OCD")), 112.10 (autism spectrum disorders) and 112.11 (neurodevelopmental disorders).  Id.  The ALJ found that D.T. did not meet or medically meet the criteria for listing 112.04 because, although there were reports of D.T.'s irritability, sleep disturbance and difficulty concentrating and some appetite disturbance (but no weight change), there was no evidence that D.T. had a "diminished interest in almost all activities, observable psychomotor agitation or retardation (other than mild fidgeting), decreased energy, feeling guilty or worthlessness or thoughts of death or suicide." R. 19.  The ALJ also found that D.T. did not meet the criteria for 112.10 because, while the evidence showed that D.T. had "qualitative deficits in verbal communication, nonverbal communication and social interaction . . . the evidence fails to establish that [D.T.] has significantly restricted, repetitive patterns of behavior, interests or activities."  R. 19.

The ALJ found that D.T. did meet the initial criteria of listings 112.06 (given her "difficulty concentrating, irritability and sleep disturbance") and 112.11 (given her "frequent distractability, difficulty sustaining attention, and difficulty organizing tasks") and, therefore, proceeded to

determine whether she had an extreme limitation in one area of relevant functioning or two marked limitations in two areas of same. R. 20. The ALJ, however, found that she had no more than moderate limitations in her ability to understand, remember or apply information; interact with others; concentrate, persist or maintain pace; or adapt or manage herself. R. 20-22. Thus, the ALJ concluded that D.T. does not have an impairment or combination of impairments that meet or medically equal any of the listings. R. 23.

The ALJ then analyzed D.T.'s impairments under the six domains to determine if she had an impairment or combination of impairments that functionally equaled the severity of the listings. Id. The ALJ found that D.T. had less than marked limitations in all six domains. First, regarding acquiring and using information, the ALJ found that D.T. had less than marked limitations because D.T. was able to learn to read, write and perform math applications and describe her activities in detail. R. 33. Second, regarding attending and completing tasks, the ALJ found that D.T. has made significant improvement in her attention while on medication, which began in May 2017. R. 34-35. Third, regarding interacting and relating with others, the ALJ found that while the record supported a finding that D.T. had some difficulties interacting with others, her ability to interact with others was improving, that the reports to Dr. Wieczorek and An were inconsistent with Campbell's testimony otherwise. R. 36. Fourth, the ALJ found that there was no allegation of D.T. having any limitations in the area of moving about and manipulating objects. D. 37. Fifth, regarding D.T.'s ability to care for herself, the ALJ found that Campbell's testimony that D.T. could not care for herself was not otherwise apparent from the record. R. 38. The ALJ also found that Campbell's testimony about D.T.'s grooming and hygiene difficulties were typical of many ten-year-olds. Id. Sixth, the ALJ noted that there were no allegations that D.T. had limitations as to her health and physical well-being. R. 39.

Accordingly, the ALJ concluded that D.T. did not have a disability within the meaning of the Social Security Act.

## VI.   Discussion

Campbell seeks reversal of the ALJ's decision or, in the alternative, for the Court to remand the case to the SSA for a new administrative hearing. D. 15. Specifically, Campbell argues that the ALJ failed to consider the structured setting that D.T. received at school, erred in finding that D.T. did not meet the "B" criteria of listings 112.06 and 112.11 and failed to perform a complete and correct analysis under the domain standard. D. 16 at 10–15.

### A.   The ALJ Properly Considered D.T.'s Structured Setting

When evaluating how a child's impairments affect her ability to function, the ALJ is required to consider the effects a structured or supportive setting have on the child's ability to initiate, sustain and complete her activities. 20 C.F.R. § 416. 924a(b)(5). D.T.'s special education classroom is a structured setting. See id. § 416.924a(b)(5)(iv)(B). A structured setting "may minimize signs and symptoms of [a applicant's] impairment[s]." Id. § 416.924a(b)(5)(iv)(c). An ALJ, therefore, must consider how the child functions in other settings and whether the child continues to function at an adequate level outside of such setting. Id.

Contrary to Campbell's contention, D. 16 at 10–12, the ALJ did consider the nature and extent of D.T.'s structured setting and whether she functioned adequately outside of this setting. The ALJ "evaluated the 'whole child' in making findings regarding functional equivalence" and "evaluated how the child functions in all settings and at all times as compared to children the same age who do not have impairments." R. 24. The ALJ recognized that D.T. had been on an IEP for a learning disability since June 2015, R. 26, that the IEP was modified to address D.T.'s learning

disability in math and written expression, in addition to ADHD and that D.T. transferred to a school with a smaller class that is structured for children who require additional support. R. 31.

While the ALJ had information from D.T.'s IEP and her performance and behavior in the classroom, he also had information about D.T.'s functioning outside the classroom including reports of her functioning at home, at play and during her interactions with the clinicians cited in the record. For one example, although social interactions were a concern when D.T. met with Dr. Caronna in April 2017, by the November 2, 2017 visit with Dr. Wieczorek, D.T. was reporting that she was friends with the girls in her class and Campbell reported that she was more social and less resistant to going places and less irritable with her cousins. R. 36. For another example, in determining that D.T. had less than a marked limitation in caring for herself, the ALJ considered her grooming and hygiene at home. D. 38. The ALJ concluded that difficulties that Campbell reported in this area were "typical of many 10-year-olds." Id. Because the ALJ considered D.T.'s behavior outside the structured setting of the classroom in his decision, the ALJ satisfied the requirement of Section 416.924a(b)(5)(iv)(c). See Santiago ex rel. V.S. v. Astrue, No. 08-cv-40248-FDS, 2010 WL 1379836, at *11 (D. Mass. Mar 31, 2020) (noting that "some courts have found that, even in the absence of an explicit [Section] 416.924a(b)(5)(iv)(c) analysis, an ALJ decision can be upheld if it implicitly addresses the issue by referencing the claimant's behavior both in and out of the structed environment") (internal quotations and citations omitted) and cases cited. Unlike the ALJ in Santiago, the ALJ addressed that he was evaluating how D.T. "functions in all settings and at all times" and his analysis addressed her functioning not just in the classroom, but other settings. R. 24.

Campbell further contends that the ALJ improperly concluded that D.T.'s structured setting was an indication that she had significant improvement in her overall functioning. D. 23 at 3. The

Court acknowledges that it is would inappropriate to rely solely upon "the structure provided by [D.T.'s] IEP in assessing [D.T.'s] ability to [function]." <u>K.A.B. by Bilodeau v. Saul</u>, 18-30174-KAR, 2020 WL 488740, at * 12 (D. Mass Jan. 30, 2020), because "[p]rogress under an IEP does not equate to success as compared to non-disabled children." <u>Id.</u> "The regulations emphasize that a child who receives special education accommodation cannot automatically be compared to non-impaired children because good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments." <u>Id.</u> (internal citations and quotations omitted). The ALJ's findings, however, was not based solely on D.T.'s functioning in a structured setting, but in other settings as discussed above. <u>See</u> R. 36-38. Even where the ALJ noted that "the record supports a finding that these actions have resulted in significant improvement in claimant's overall functioning," R. 31, "these actions" was referring not only to the accommodations in D.T.'s IEP for a structured classroom setting, but counseling, switching to Adderall and taking Citalopram for anxiety. <u>Id.</u> Such improvements in functioning, therefore, were not limited to the structured setting of the classroom now mandated by the IEP. R. 22, 31; <u>see</u> <u>e.g.</u>, R. 574, 602-03 (reporting D.T. has had an improved response to Adderall compared to Ritalin).

To the extent that Campbell asserts that the ALJ erred by substituting his own lay opinion for that of acceptable medical and non-medical sources, the Court rejects this contention as the ALJ, relied upon the opinions of Dr. Derecho and Dr. Burke, R. 31, as well as reports from Dr. Wieczorek and An. R. 21. Also, contrary to Campbell's contention, the ALJ did not "choose to ignore" Dr. Macaulay's April 2017 note or any other assessment noting D.T.'s difficulties in school. D. 16 at 12–13. The ALJ also discussed D.T.'s June 2017 psychological report and her May 2017 assessment. R. 20, 26, 32-33. These assessments, however, occurred before D.T.

switched to the more effective medical treatment, R. 339, 608-09, which contributed to significant improvement in D.T.'s overall functioning.  R. 31.

For all these reasons, the Court concludes that the ALJ properly considered D.T.'s structured setting.

**B.      The ALJ Did Not Err in Finding That D.T. Did Not Meet The "B" Criteria of Listings 112.06 and 112.11**

An impairment "meets" a listing "when it satisfies all of the criteria of that listing." § 416.925(c)(3).  There is substantial evidence in the record to support the ALJ's finding that D.T. does not meet the B criteria of listings 112.06 and 112.11.  To satisfy criteria B of listings 112.06 and 112.11, a child must have an extreme limitation of one, or marked limitation of two, functional areas: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. pt. 404 subpt. P, App. 1, Part A2, § 12.00(E).

Campbell argues that the ALJ did not give sufficient weight to the medical records that support a conclusion that D.T. still struggles with paying attention in class and has not made progress even with support.  D. 16 at 14.  Even where a "record arguably could justify a different conclusion," Whitzell, 792 F. Supp. 2d at 148, this Court must uphold the determination so long as it is supported by substantial evidence.  Id.  Here, the record contains substantial evidence supporting the ALJ's conclusion.

*1.      Understanding, Remembering or Applying Information*

An ALJ must determine the child's ability to learn, recall and use information to perform age appropriate activities.  20 C.F.R. pt. 404, subpt. P, App. 1 § 12.00(E)(1).  The ALJ concluded that D.T. had no more than moderate limitations in her ability to understand, remember and apply information because, while she has had difficulties associated with her learning disability, D.T.

can read, write, perform many math applications and describe her activities in detail. R. 20-21. The ALJ's conclusion relied upon, among other things, Campbell's reports to Dr. Caronna, D.T.'s 2016-2017 school report, D.T.'s psychological evaluation and testing, Dr. Wieczorek's report that D.T.'s memory was intact and Campbell's testimony. Id. The 2016-2017 school report noted that D.T needed occasional reminders about grammar issues in her sentences, that her handwriting was sometimes illegible and that she had difficulties with grade level math. R. 548. It also noted, however, that D.T. was able to decode fourth grade level texts, she demonstrated solid comprehension skills, enjoyed reading independently and that she was able to find the main idea of a grade level passage and make reasonable predictions. Id. D.T.'s 2017-2018 IEP similarly noted her strengths and struggles with reading. R. 407.

Campbell points to evidence that the ALJ already considered, such as D.T.'s medical records, that noted her distractibility and difficulty sustaining attention, and asks this Court to give them a greater weight than the other evidence in the record that suggest that D.T.'s understanding, remembering and applying information has improved. An ALJ's decision cannot be reversed merely because there is evidence in the record that supports a different conclusion. Whitzell, 792 F. Supp. 2d at 148; see Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 414 (6th Cir. 2011) (holding that the court "reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility or substitute its judgment for that of the ALJ"). Given all the evidence relied upon by the ALJ, there is substantial evidence supporting the ALJ's finding that D.T. has no more than moderate limitations in understanding, remembering or applying information.

## 2. *Interacting with Others*

The ALJ must determine the child's ability to relate and cooperate with others. 20 C.F.R. pt. 4040, subpt. P, App. 1 § 12.00(E)(2). The ALJ concluded that D.T. had no more than moderate limitations in her ability to do so based upon medical reports, as well as her speech and language assessment. R. 21-22. The ALJ noted that in April 2017, D.T.'s social skills "were an area of concern." R. 21. She gravitated toward younger children, had chased another child with a brick and pulled a knife on her sister. Id. The ALJ, however, noted that D.T.'s social interactions had improved over time. Id. During D.T.'s speech and evaluation session in June 2017, she was cooperative and attentive and, after a rapport was established with the evaluator, she had adequate eye contact and her affect changed. Id. According to reports from Dr. Wieczorek's November 2018 report, Campbell reported that D.T. was more social, less irritable with her cousins and had many friends in her class. Id. An reported in February 2018 that Campbell stated that D.T. seemed happy at her new school and liked the other girls. Id.

Campbell, once again, points to evidence that the ALJ did consider, such as records noting D.T.'s anger and difficulties she had interacting with people earlier in her medical history and prior to her present medication, D. 16 at 18; R. 347, to support her contention that D.T. has more than moderate limitations in interacting with others. The ALJ considered Campbell's testimony that, even with medication, D.T. remains disruptive, not knowing how to interact with children, having few friends and being frightened of strangers. D. 21. The ALJ concluded that such testimony was inconsistent with Campbell's report (and D.T.'s reports) to Dr. Wieczorek and An. D. 21. The Court will not re-weigh the evidence, resolve any conflicts in the evidence or second-guess credibility findings by the ALJ, Reynolds, 424 F. App'x at 414; see McNelley v. Colvin, No. 15-cv-1871, 2016 WL 2941714 at *2 (1st Cir. 2016) (noting that credibility determinations by the

ALJ are entitled deference especially when supported by specific findings), where there is substantial evidence in this record, and as cited by the ALJ, to support his conclusion as there is in this case.

### 3. *Concentrating, Persisting or Maintaining Pace*

The ALJ must analyze the child's ability to focus attention on work activities and stay on task at a sustained rate. 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00E(3). The ALJ found that D.T. had no more than moderate limitations in her ability to concentrate, persist or maintain pace based on reports to Dr. Wieczorek in November 2017 and January 2018 that D.T.'s attention and concentration had improved since she began taking Adderall. R. 22. By November 29, 2017, Campbell had reported that there was a significant improvement with the medication. Id. By January 31, 2018, Campbell reported that D.T. was remaining focused with her current medications. Id. The ALJ did not credit Campbell's testimony that D.T. was still having difficulty with sitting still where she did not mention this to Dr. Wieczorek and there was no evidence that the school was reporting such problems with her attention. R. 22. Instead, Campbell informed Dr. Wieczorek that D.T. was more focused with her current medication. R. 22.

Campbell argues that the ALJ erred because there is sufficient evidence in the record to show that D.T. has consistently struggled with issues of concentration and attention. D. 20 at 14. The ALJ considered the evidence that Campbell references and gave this evidence less weight because such evidence, largely Campbell's testimony, was inconsistent with other evidence in the record and such issues occurred before D.T. began taking her current medications. R. 22. For all these reasons, there was substantial evidence in the record supporting the ALJ's finding that D.T. had no more than moderate limitations in this area of functioning.

###### 4.  *Adapting or Managing Oneself*

The ALJ must determine the child's ability to regulate emotions, control behavior and maintain well-being in age appropriate activities and settings.  20 C.F.R. pt. 404, subpt. P, App. 1 § 12.00(E)(4).  The ALJ found that D.T. had no more than moderate limitations in her ability to adapt or manage herself based on Dr. Wieczorek's report that D.T. had improved significantly since she begun taking medication.  R. 22.  The ALJ also determined that, while D.T. has had a history of anxiety for several years, therapy and medication has improved her symptoms.  R. 23.

Campbell argues that the ALJ failed to give more weight to reports about D.T.'s difficulties with adapting and managing herself.  D. 16 at 19.  Most of the evidence that Campbell points to predates D.T.'s current medication regimen.  See D. 16 at 19 (discussing D.T.'s June 2017 psychological evaluation that she is unable to independently engage in self-care, Dr. Raphael's May 2017 report that D.T. has difficulty bathing, feeding, sleeping and dressing and D.T.'s IEP, conducted after a June 2017 meeting recommending specialized instructional services for self-regulation).  The evidence Campbell points to that post-dates D.T.'s medication is Campbell's own testimony, D. 23.  The ALJ chose to give little weight to that testimony because the entirety of the record "shows that since being on medication, the claimant has had much better control of emotions and behaviors."  D. 23.  That is, the reports by Campbell in 2018 that D.T. was happy, liked her new school and the other girls and that her teachers reported that she was cooperative and communicating well with peers and teachers was "inconsistent with a minimal capacity to adapt to changes."  Id.  Accordingly, the ALJ did not err in determining that D.T. had no more than moderate limitations in her ability to adapt or manage herself.

**C.** **The ALJ Properly Performed A Complete and Correct Analysis Under the Domain Legal Standard**

If a severe impairment does not meet or medically equal any listing, the ALJ must determine whether it results in limitations that functionally equal the listings. § 416.926a(b). To determine if an impairment is functionally equal to a listing the ALJ will assess the applicant's functional capacity in terms of six domains: i) acquiring and using information; ii) attending and completing tasks; iii) interacting and relating with others; iv) moving about and manipulating objects; v) caring for oneself; and vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child's impairment will functionally equal a listed impairment if the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. § 416.926a(a). The regulations define a "marked limitation" in a domain as one that "interferes seriously" with a child's ability to "independently initiate, sustain, or complete activities." § 416.926a(e)(2)(i). An "extreme limitation" in a domain is one that is more than marked and interferes "very seriously" with a child's ability to "independently initiate, sustain, or complete activities." § 416.926a(e)(3)(i). In assessing whether the child has a "marked" or "extreme" limitation, the ALJ must consider the functional limitations "resulting from all of [the claimant's] impairments, including their interactive and cumulative effects." § 416.926a(e)(1)(i).

Campbell contends that D.T. has marked limitations in four of the six areas of functioning: acquiring and using information, attending and completing tasks, interacting and relating to others and caring for herself. D. 16 at 15-19. For the reasons discussed below, the Court concludes that the ALJ did not err in finding that D.T. did not have an impairment or combination of impairments that functionally equal the severity of the listings as to the functional areas challenged by Campbell.

### 1.    *Acquiring and Using Information*

The ALJ is required to consider how well a child acquires or learns information, and how well a child uses the information she has learned. 20 C.F.R. § 416.926a(g).  A school-age child (a child between the ages of six and twelve) should be able to learn to read, write, do math and discuss history and science.  Id. § 416.926a(g)(2)(iv).  While there is evidence that D.T. has some challenges in her ability to acquire and use information, because D.T. can read, write and do some math, there is substantial support in the record for the ALJ's determination that D.T.'s limitations are less than marked.  S.T. by Taylor v. Berryhill, No. 2:16-cv-717, 2017 WL 6945185, at * 11 (E.D. Va. Dec. 21, 2017).

### 2.    *Attending and Completing Tasks*

This domain analyzes a child's ability to focus and maintain attention and her ability to carry through her activities.  20 C.F.R. § 416.296a(h).  A school-age child should be able to focus her attention, follow instructions, organize school materials and complete schoolwork and homework assignments.  Id. § 419.296a(h)(2)(iv).  She should be able to focus on details and avoid careless mistakes avoided by others her age, change her activities or routines, stay on task and in pace when appropriate, transition between events and activities, sustain her attention sufficiently to read by herself, complete family chores and participate in group sports.  Id.

Campbell contends that, because D.T. required specialized instruction in a small group, attended to tasks with difficulty and needed one-on-one support, her symptoms demonstrate a marked functional limitation in attending and completing tasks.  D. 16 at 17.  The ALJ, however, considered all these facts in his findings.  The ALJ noted that when D.T. first met Dr. Caronna she was highly distractible at school and had difficulty finishing her work.  R. 34.  The ALJ took notice of D.T.'s 2016-2017 school report that stated that she required teacher assistance to complete daily

reading lessons because she could not focus on task, that she needed many reminders to face the teacher and listen to speakers, that she would perseverate on activities and that she had to be asked several times to begin and complete academic tasks.  R. 34.

The ALJ, however, also noted that when D.T. and Campbell met with Dr. Wieczorek twice in November 2017, Campbell reported that D.T.'s concentration and focus had improved, that her new medication helped D.T. feel more alert and that D.T. had significant improvement with her medication.  Id.  The ALJ also noted that during a January 2018 visit with Dr. Wieczorek, Campbell reported that D.T. was remaining focused with her current medication.  Id.  Dr. Wieczorek noted that D.T.'s attention and concentration were good.  Id.  Thus, the ALJ found that the record supported a finding that D.T. had significant improvement in her attention because of the Adderall.  For these reasons, the Court concludes that the ALJ did not err in finding that D.T. had no more than moderate limitations in attending and completing tasks.

### 3. *Interacting and Relating to Others*

This domain considers a child's ability to "initiate and sustain emotional connection with others, develop and use language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possession of others."  20 C.F.R. § 416.926a(i).  School age children should be able to form durable friendships with one or more of their peers, learn how to work with others on projects and problem solving, better understand the points of view of others and accept differences, tell stories and speak with others of all ages.  Id. § 416.926a(i)(2)(iv).  While there is evidence that D.T. had challenges interacting with others, there was evidence in the record, as discussed above, that D.T. has built friendships and has connected with her peers and family to support the ALJ's determination that she has less than a marked limitation in this domain.

## 4. Caring for Oneself

The record contains evidence that D.T. has struggled with self-care. This evidence includes Dr. Caronna's April 2017 notes stating that D.T. has difficulty bathing, feeding, sleeping and dressing herself without appearing messy, R. 347, D.T.'s June 2017 psychological report that states that she has difficulty with self-care, R. 380 and Campbell's testimony that she picks out D.T.'s clothes, lays everything on the bed and must remind her to bathe properly. R. 133. Again, aside from Campbell's own testimony, the evidence noting D.T.'s deficiencies in caring for herself are before she began taking her current medication.

Campbell testified that she needs to lay out all of D.T.'s clothing, assist her with dressing so that she does not look messy and remind her how to bathe. R. 133-134. Although Campbell also testified that she is with D.T. all the time and does everything for her, R. 137, the ALJ noted that she had previously reported that she worked 65 hours per week in two jobs. R. 23. To the extent that Campbell expressed continuing concerns about D.T.'s grooming and hygiene, the ALJ found that such concerns appear to be consistent with those of other children D.T.'s age. R. 23. For these reasons, the Court concludes that the ALJ did not err in finding that D.T. did not functionally equal any of the listings.

### D. The ALJ Properly Relied Upon Dr. Derecho and Dr. Burke's Reports

Campbell contends that that the ALJ erred in giving great weight to the opinions of Dr. Derecho and Dr. Burke, the consultative examiners, because those doctors did not have access to D.T.'s full record. D. 23 at 5. Campbell notes that the record is "replete with instances of lack of improvement" by D.T. after Dr. Derecho and Dr. Burke's reports in June and August 2017. Id. An ALJ may rely on older evidence when the information in the evidence remains accurate. See Ferland v. Astrue, No. 11–cv–123–SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31,

2011) (finding that "an ALJ may rely on such an opinion where the evidence postdating the reviewer's assessment does not establish any greater limitations . . . or where the medical reports of claimant's treating providers are arguably consistent with . . . the reviewer's assessment").  First, the instances of lack of improvement that Campbell points to, namely D.T.'s behavior at a mental status examination and the fact that she was switched from Adderall IR to Adderall XR, were discussed by the ALJ.  R. 29.  The ALJ still found that D.T. had improved in light of the later reports from Dr. Wieczorek and An from November 2017 through April 2018 that Campbell informed them that D.T.'s condition had improved since she began taking Adderall and Citalopram.  R. 21-22, 30, 36, 38.  Since Dr. Burke and Dr. Derecho's reports were corroborated by these later reports from Dr. Wieczorek and An, it was not error for the ALJ to rely, in part, upon Dr. Derecho and Dr. Burke's earlier opinions as the basis for his findings.  See Ferland, 2011 WL 5199989, at *4.

## VII.    Conclusion

For the foregoing reasons, the Court DENIES Campbell's motions to reverse and remand, D. 15, and GRANTS the Commissioner's motion to affirm, D. 19.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge